Whitakee, Judge,
delivered the opinion of the court:
Both plaintiff, a surety company, and the trustees in bankruptcy of Pennsylvania Drydock and Shipbuilding Co., Inc., are claiming a fund in the hands of defendant which was owed to the bankrupt for the reconditioning of two of defendant’s vessels. The bankrupt completed the reconditioning and turned the vessels over to defendant, but before it *162 had paid the laborers and materialmen it was declared a bankrupt.
Afterwards, the surety company, which had executed both the performance and the payment bonds, paid the laborers and materialmen to the full extent of its bond on one of the ships. When it appeared that the claims on the other bond, written on the S.S. William Tyler, exceeded $45,000, the amount of the bond, the surety instituted an interpleader action against the claimants. All the claimants, except the largest creditor, were willing to and did release the surety in exchange for payment of their pro rata shares. Since the surety disputed the validity of the remaining creditor’s claim, the suit went forward as to it. After the court made findings in favor of the creditor on the issue of liability, the parties agreed on a settlement of the claim for $11,733.50. Since this sum was less than the amount previously asserted by this creditor, which was used in computing the pro rata share of each creditor, the total amount paid on the Tyler payment bond was $41,079.08 on a total liability on the bond of $45,000.
Where a surety pays the claims of laborers and material-men, it has been held, under a variety of circumstances, that the surety has a prior right to the funds which were owing to the contractor at the time of his default. But the trustees in bankruptcy say that the surety in this case does not have a prior right to the funds because it has not paid all laborers and materialmen in full. We think the surety in this case does have a prior right to them.
In United Pacific Insurance Company v. United States, et al., 162 Ct. Cl. 361, 319 F. 2d 893 (1963), we held that the failure to pay the claim of one materialman or laborer did not defeat the surety’s right to priority, because the material-man had no right to the moneys in the hands of the United States, his sole remedy being on the payment bond. The United States had the right to use the money in its hands to pay laborers and materialmen (Pearlman v. Reliance Insurance Company, 371 U.S. 132 (1962) ; National Surety Corp. v. United States, 132 Ct. Cl. 724, 133 F. Supp. 381 (1955)), but the laborers and materialmen could not force it to do so. *163 United States v. Munsey Trust Company, 332 U.S. 234 (1947); Continental Casualty Ins. Co. v. United States, 145 Ct. Cl. 99, 169 F. Supp. 945 (1959).
But this is said to differ from United Pacific Insurance Company v. United States, supra, in that all the creditors still have a claim against the bankrupt to the extent of the unpaid balance on their claims. However, in the United Pacific Insurance Company case the sole unpaid creditor also had a claim against the bankrupt, but we held he was not entitled to priority over the surety. This was because laborers have no lien on a vessel belonging to the United States, as they would have if the vessel were privately owned, and, hence, they have no prior right to the funds owing for work done and materials furnished for use in reconditioning the vessel. Because they had no lien against the vessel to insure payment of their claims, the Miller Act (49 Stat. 793 (1935), 40 U.S.C. § 270a (1958)) was passed, requiring the contractor to secure a bond conditioned upon paying them. The surety has now paid to each creditor an agreed amount in full settlement of his rights on the bond. The amount of $41,079.08 so paid exceeds the amount of $26,904.37 in the hands of the United States. The surety has thus discharged the moral obligation of the United States, to protect laborers and materialmen, in an amount in excess of the amount in the hands of the United States, which the United States might have used to pay them, except for the bond, and it is, therefore, entitled to be reimbursed to the extent of these funds. This right must be satisfied prior to the claims of laborers and materialmen. Prairie State Bank v. United States, 164 U.S. 227 (1896); Henningsen v. United States Fidelity and Guaranty Co., 208 U.S. 404 (1908) ; Pearlman v. Reliance Insurance Company, supra; United States v. Munsey Trust Company, supra.
Judgment will be entered in favor of plaintiff Continental Casualty Company in the amount of $26,904.37.
The claim of Edward J. Breen, et al., trustees in bankruptcy of the Pennsylvania Drydock and Shipbuilding Co., Inc., is dismissed.
*164 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The original plaintiff, Continental Casualty Company (referred to hereinafter as “Continental”), is a corporation organized and existing under the laws of the State of Illinois, with a place of business at 310 S. Michigan Avenue, Chicago, Illinois.
2. The third-party plaintiffs, Edward J. Breen, Paul F. Harron, and Mitchell W. Miller, are the trustees in bankruptcy (and they will be referred to hereinafter as “the trustees”) of Pennsylvania Drydock & Shipbuilding Company, Inc. (referred to hereinafter as “Pennsylvania Dry-dock”) .
3. Under the date of January 2, 1951, Pennsylvania Dry-dock entered into a written contract with the defendant. The contract was numbered MCc-62693 and was described as a “Master Lump Sum Contract.” It provided in pertinent part as follows:
WHEREAS, the parties now desire to agree upon this contract which will by reference be incorporated into and become a part of lump sum job orders for work on or for named merchant vessels, or portions thereof, hereafter from time to time to be executed by the parties hereto;
NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter contained, the parties agree as follows:
*****
3. Payment.
* * * * *
(e) Moneys ascertained to be or become due or claimed by any person for work performed or materials or services furnished in connection with the work, together with probable expenses to be incurred in connection therewith, may be withheld by the Contracting Officer until all such persons’ claims and demands shall have been settled.
■* * * # *
4. No Liens.
(a) The Contractor shall pay all costs and expenses incident to any work performed by it or for its account, *165 and shall not have any right, power or authority to and shall not (1) create, incur, suffer or permit to be placed or imposed upon any vessel (or portion thereof) upon which work is performed, its hull, engines, tackle, apparel and furniture of all kinds, any maritime lien, or other lien or encumbrance or charge in any way arising from any act or omission of the Contractor; or (2) incur any debt, obligation or charge upon the credit of the vessel. The Contractor shall, orally or in writing, inform all persons dealing with it in performing the work of the provisions of this paragraph.
(b) The Contractor shall immediately discharge or cause to be discharged any lien or right in rem of any kind, other than in favor of the Government or in favor of the owner of the vessel on which the work is performed, which, as the result of any act or omission of the Contractor (or any person furnishing materials or labor on behalf of the Contractor) shall at any time exist or arise with respect to the machinery, fittings, equipment, material or work furnished or ¡performed under any job order or any supplemental job order. If any such lien or right in rem is not immediately discharged, the Administrator may, without prior notification to the Contractor, discharge or cause to be discharged said lien or right in rem and upon such discharge the Contractor shall be liable to the Administrator for all costs and expenses incident to or connected with the discharge of said lien or right in rem.
* J¡: * * ’ *
24. Labor Provisions.
* * * # *
(d) If the contract price is in excess of $2,000, the Contractor and its subcontractors shall pay all mechanics and laborers employed directly upon the site of the work, unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account, the full amount accrued at time of payment, computed at wage rates not less than those which may be determined by the Secretary of Labor pursuant to the provisions of the Act approved March 3, 1931 (46 Stat. 1494), as amended, to be the prevailing rates for the various classes of such laborers and .mechanics (subject to Executive Order No. 9250, if applicable, and the General Orders and Eegulations issued thereunder)' regardless of any contractual relationship which may be alleged to exist between the Contractor or its subcontractors and such laborers and mechanics; and the scale of wages to be paid shall be posted by the Con *166 tractor in a prominent and easily accessible place at the site of the work. The Contracting Officer shall have the right to withhold from the Contractor so much of accrued payments as may be considered necessary by the Contracting Officer to pay to laborers and mechanics employed by the Contractor or any subcontractor on the work the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by such laborers and mechanics and not refunded to the Contractor, subcontractors, or their agents.
4. At the times involved herein, the S.S. William Tyler and the S.S. Franhlin H. King were owned by the defendant. From December-1947 until August 1951, these vessels were maintained at Lee Hall, Virginia, as part of the Keserve Fleet.
5. On or about August 13, 1951, the defendant delivered the S.S. William Tyler to Wessel, Duval and Co., Inc., the defendant’s agent, pursuant to a service agreement dated June 19, 1951, between the defendant and Wessel, Duval and Co., Inc.
6. On or about August 24, 1951, the defendant delivered the S.S. Franhlin H. King to Pacific Far East Line, Inc., the defendant’s agent, pursuant to a service agreement dated April 5, 1951, between the defendant and Pacific Far East Line, Inc.
7. (a) Under the date of August 27, 1951, Pennsylvania Drydock entered into job order No. 16 with the defendant for repairs to the S.S. William Tyler. The provisions of contract No. MCc-62693 (see finding 3) were incorporated by reference in job order No. 16.
(b) Pursuant to the provisions of the Act of August 24, 1935, as amended (40 U.S.C. 270a-270e; hereinafter referred to as “the Miller Act”), Pennsylvania Drydock as principal and Continental as surety executed performance and payment bonds to the defendant under the date of August 29, 1951. Each of these bonds was in the amount of $45,500. The payment bond was conditioned upon the prompt payment of all persons supplying labor and material in the *167 prosecution of the work in connection with job order No. 16. It contained the following provision (among others):
NOW THEBEFORE, if the principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived, then this obligation to be void; otherwise to remain in full force and virtue.
(c) Pennsylvania Drydock completed the work called for under job order No. 16.
8. (a) Under the date of September 10, 1951, Pennsylvania Drydock entered into job order No. 19 with the defendant for repairs to the S.S. Franklin H. King. The provisions of contract No. MCc-62693 (see finding 3) were incorporated by reference in job order No. 19.
(b) Pursuant to the provisions of the Miller Act, Pennsylvania Drydock as principal and Continental as surety executed and delivered performance and payment bonds to the defendant under the date of September 21, 1951. Each of these bonds was in the amount of $51,000. The payment bond was conditioned upon the payment of all persons supplying labor and material in the prosecution of the work provided for in job order No. 19. It contained the following provision (among others) :
NOW THEBEFORE, if the principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived, then this obligation to be void; otherwise to remain in full force and virtue.
(c) Pennsylvania Drydock completed all the work under job order No. 19; and the S.S. Franklin H. King was delivered to the defendant and accepted by it on October 18, 1951.
9. Following the completion of the repairs to the S.S. William Tyler and to the S.S. Franhlin H. King pursuant *168 to job orders Nos. 16 and 19, respectively, as indicated in findings 7 and 8, these vessels were used by the defendant, under the respective agreements referred to in findings 5 and 6, for the carriage of grain and coal under a program of the Economic Cooperation Administration, an executive agency of the defendant.
10. On October 15, 1951, an involuntary petition in bankruptcy was filed against Pennsylvania Drydock in the United States District Court for the Eastern District of Pennsylvania. On October 24, 1951, an order was entered in that court approving Pennsylvania Drydock’s petition for reorganization under Chapter X of the Bankruptcy Act, as amended (11 U.S.C., Chapter 10). Edward J. Breen and Paul F. Harron were subsequently appointed, and they duly qualified, as trustees. On June 17, 1952, an adjudication of bankruptcy was entered against Pennsylvania Drydock. Thereafter, Edward J. Breen, Paul F. Harron, and Mitchell W. Miller were duly elected, and they qualified, as trustees of Pennsylvania Drydock.
11. The date of final settlement of job order No. 16 for repairs to the S.S. William Tyler and the date of final settlement of job order No. 19 for repairs to the S.S. Franhlin H. King (as the term “final settlement” is used in the Miller Act) was December 5, 1951, in each instance.
12. (a) Upon the final settlements of job orders Nos. 16 and 19, balances were due from the defendant thereunder as follows:
Job order No. 16-$45,769. 00
Job order No. 19- 24,539.29
(b) There was also due from the defendant to Pennsylvania Drydock at the time of the latter’s bankruptcy the sum of $818.90 on a job order for repairs to the S.S. Binger Herman.
(c) The sums referred to in paragraphs (a) and (b) of this finding, totaling $71,127.19, have not been paid by the defendant.
13. (a) The defendant has offsets of $44,222.82 against the balances due by the defendant, as described in finding 12. The offsets are for withholding, F.I.C.A., and Federal Un *169 employment Taxes of Pennsylvania Drydock for the year 1951, together with interest and penalties, and for certain damage claims of the defendant against Pennsylvania Dry-dock that are unrelated to job orders Nos. 16 and 19.
(b) There is, therefore, due and owing from the defendant under the job orders referred to in finding 12 the net sum of $26,904.37. This amount is being held by the defendant pending the final resolution by the court of the conflicting claims of Continental and the trustees.
14. (a) The following table shows (1) the names of persons or firms that supplied labor or material, or both, to Pennsylvania Drydock in the prosecution of the work provided for in job order No. 16 relating to repairs to the S.S. William Tyler, (2) the amount that was due from Pennsylvania Drydock to each supplier for such labor or material, or both, (3) the amount that was paid to each supplier by Continental as the surety on the payment bond referred to in finding 7 (b), and (4) the date on which such payment was made by Continental to each supplier:
Supplier Amount due supplier Amount paid by Continental Date paid
Haenn Ship Ceiling & Refitting Corp__ $9,700.00 $8,902.84 11-29-55
Harbison-Walker Refractories Co_ 2,909.63 2,290.96 9-28-53
The Farboil Co__ 3,646.12 3,346.48 I-11-56
Quaker City Lumber & Supply Co. 2,032.34 1,600.20 9-25-53
Henry B. Pancoast & Co., Inc_ 2,317.54 1,824.76 9-25-53
J. Thomas Scott, Inc_ 476.00 374.79 9-25-53
Carl W. Berner, William F. Berner and Albert H. Wood, co-partners, t/a Welders Supply_ 300.00 236.21 9-25-53
A. J. Laupheimer and C. B. Smith, co-partners, t/a Curtis Steel Co_ 3,500.00 2,755.80 9-25^53
Theo. C. TJlmer, Inc__ 3,650.00 2,873.90 9-25-53
Progress Marine Corp_ 4,150.00 3,267.59 9-25-53
Manning, Maxwell & Moore, Inc_ 424.00 333.84 9-25-53
L. Sichel & Sons', Inc. 203.39 160.14 9-25-53
Walter A. Schauder, t/a Manufactured Rubber Products Co___ 189.47 149.18 9-25-53
Walter Kidde & Co., Inc_ 786. 00 613.08 12- 1-55
M. A. Bruder & Sons, Inc_ 397.81 397.81 8-27-52
Joseph S. Carlitz___ 280.00 218.00 II-29-55
34,962.30 29,345.58 Total.
*170 (b) Continental received from each of the suppliers listed in paragraph (a) of this finding a receipt and release, and also an assignment of the supplier’s claim against Pennsylvania Drydock to the extent of the amount paid the supplier by Continental.
(c) The circumstances under which Continental’s payments to the suppliers mentioned in this finding and in finding 16 were made are related in findings 22-28.
(d) Harbison-Walker Refractories Company, The Far-boil Company, Henry B. Pancoast & Co., Inc., J. Thomas Scott, Inc., -Carl W. Berner et al., trading as Welders Supply, Theo. C.. Ulmer, Inc., and Walter Kidde & Co., Inc., have each filed a proof of claim in the bankruptcy of Pennsylvania Drydock. No such proof of claim has been filed by the other suppliers listed in paragraph (a) of this finding.
15. (a) The following table shows (1) the names of persons or firms that supplied labor or material, or both, to Pennsylvania Drydock in the prosecution of the work provided for in job order No. 19 relating to repairs to the S.S. Franklin H. King, (2) the amount that was due from Pennsylvania Drydock to each supplier, (3) the amount that was paid to each supplier by Continental as the surety on the payment bond referred to in finding 8 (b), and (4) the date on which such payment was made by Continental to each supplier:
Supplier Amount due supplier Amount paid by Continental Date paid
Progress Marine Corp___ $3,500.00 $3,500.00 10-27-52
Walter Kidde & Co., Inc_ 199.80 199.80 10-31-52
Manning, Maxwell & Moore, Inc_ 429.64 429.64 10-27-52
Elisha Webb & Son Co_ 89.25 89.25 11- 3-53
A. J. Laupheimer and C. B. Smith, co-partners, t/a Curtis Steel Co_ 1,339.02 1,339.02 3- 6-53
Theo. C. Ulmer, Inc_-_ 1.160.34 1.160.34 9-25-53
Quaker City Lumber & Supply Co_ 272.00 272.00 9-25-53
McArdle <fc Cooney, Inc_ 382.80 382.80 1- 9-53
Henry B. Pancoast & Co., Inc__ 869.75 869.75 9-25-53
Carl W. Berner, William F. Berner and Albert H. Wood, co-partners, t/a Welders Supply_ 450.00 450.00 ÍW4-53
M. A, Bruder & Sons, Inc_ 1.631.35 1.631.35 8-27-52
10,323.95 10,323.95 Total.
*171 (b) Continental received from each of the suppliers listed in paragraph (a) of this finding a receipt and release, and also an assignment of the supplier’s claim against Pennsylvania Drydock.
(c) Theo. C. Ulmer, Inc., McArdle & Cooney, Inc., Henry. B. Pancoast & Co., Inc., and Carl B. Berner et al., trading as Welders Supply, have each filed a proof of claim in the bankruptcy of Pennsylvania Drydock. No such proof of claim has been filed by the other suppliers listed in paragraph (a)of this finding.
16.(a) Atlantic Port Contractors (referred to hereinafter as “APC”) claimed that it had paid payrolls of Pennsylvania Drydock for labor performed in the prosecution of the work provided for in job orders Nos. 16 (relating to the S.S. William Tyler) and 19 (relating to the S.S. Franklin H. King) in the amounts of $24,288.81 and $21,622.92, respectively, and that such amounts were due from Continental on the payment bonds relating to those job orders. Continental paid the following amounts on the dates indicated to APC.pursuant to a settlement of the claims mentioned in this paragraph:

Amount paid Date

Joto order No. 16_$11, 733. 60 111-29-55
Job order No. 19_ 13,266.50 11-29-55
(b) The circumstances under which Continental made payments to APC and the suppliers mentioned in finding 14 are related in findings 22-28.
(c) APC has filed a proof of claim in the bankruptcy of Pennsylvania Drydock.
17. On December 23, 1952, Continental filed a proof of claim in the bankruptcy of Pennsylvania Drydock.
18. (a) The following table shows-(1) the names of other persons or firms that have filed proofs of claim in the bankruptcy of Pennsylvania Drydock on the ground that they supplied labor or material, or both, in connection with repairs to the S.S. William Tyler or the S.S. Franklin H. King, or both, (2) the amounts claimed, and (3) the names of the vessels allegedly involved in the several claims:
*172 Claimant Amount claimed Vessel
Q. Wilhelm_ $128.50 S.S. William Tyler
Metal Weld, Inc_ 82.25 S.S. Franhlin H. King
Do_ 129.49 S.S. William Tyler
Baltimore Copper Paint Co.. 5,160.00 Undivided among:
S.S. William Tyler,
S.S. Rufus Choate,
and S.S. George Steers
Riggs & Bro__,.. 153.50 S.S. William Tyler
Sunshine Scientific Instruments.. 1,128.36 S.S. William Tyler
Do_ 1,233.44 S.S. Franklin H. King
(b) Continental does not concede, and the evidence in the record does not establish, that the claimants listed in paragraph (a) of this finding had valid claims in the amounts indicated for labor or material, or both, supplied to Pennsylvania Drydock in connection with job orders Nos. 16 and 19.
(c) G. Wilhelm, Riggs and Bro., and Sunshine Scientific Instruments did not give notice of their claims to, or make demand upon. Continental.
(d) Continental was given notice of the claims of Metal Weld, Inc., and Baltimore Copper Paint Co. With respect to the claims of Metal Weld, Inc., investigation disclosed that the $82.25 claimed on the S.S. Franhlin E. King was for material ordered for the S.S. Lineolm, Steffens, and that the $129.49 claimed on the S.S. William Tyler was for material ordered for the S.S. Charles Keffer. With respect to the claim of Baltimore Copper Paint Co., investigation disclosed that only $137.50 of the claim related to contracts bonded by Continental, and this was in connection with repairs to the S.S. Charles Keffer. Continental paid $137.50 to Baltimore Copper Paint Co.
19. From and after October 24, 1951, when the petition of Pennsylvania Drydock for reorganization under Chapter X of the Bankruptcy Act, as amended, was approved, the trustees were authorized to operate, and they continued to operate, the business of Pennsylvania Drydock. Contracts were entered into by the trustees with the defendant for repairs to the following vessels (among others) :
IT.S.S. Cleveland
U.S.S. Cape Fair Weather
*173 U.S.S. James Turner

S.S.William Patterson

S.S.Gulfport

S.S.Victory

S.S.Russel A. Alger

S.S.Herman Melville

S.S.Benj. J. Warner

20. Claims totaling $76,937.76 for labor or material, or both, supplied to the trustees have been filed in the bankruptcy of Pennsylvania Drydock. These claims do not cover any of the expenses of the trustees or of their counsel, the trustees’ commissions, or fees to the accountants and attorneys of the trustees. None of these claims has been paid.
21. The only assets of the bankrupt Pennsylvania Dry-dock or of the trustees, to the knowledge of the trustees, is cash on deposit with the Benjamin Franklin Federal Savings & Loan Association and the claims against the defendant referred to in finding 12. The amount on deposit with the Benjamin Franklin Federal Savings & Loan Association was $3,982.47 as of June 30,1962.
22. (a) On October 1,1952, APC instituted in the United States District Court for the Eastern District of Pennsylvania Civil Action No. 14274, seeking to recover $24,288.81 on the payment bond that was executed and delivered in connection with job order No. 16 for repairs to the S.S. William Tyler (which bond will hereinafter be referred to as “the Tyler bond”), and Civil Action No. 14273, seeking to recover $21,622.92 on the payment bond that was written in connection with job order No. 19 for repairs to the S.S. Franklin II. King (which bond will hereinafter be referred to as “the King bond”).
(b) The amount claimed by APC on the Tyler bond brought the total amount of the claims on that bond to a figure which exceeded the amount of the bond, i.e., $45,500.
(c) There was a substantial dispute between Continental and APC as to whether the claims of APC were for labor or material supplied in the prosecution of the work under job orders Nos. 16 and 19.
*174 23. On December 16, 1952, Continental instituted in the United States District Court for the Eastern District of Pennsylvania Civil Action No. 14598 (hereinafter referred to as “the interpleader action”), in which it joined claimants on the Tyler bond that had instituted civil actions on such bond. After the addition and dismissal of certain parties, the claimants remaining in such civil action consisted of APC and the first 13 suppliers listed in the table set out in finding 14(a) (which suppliers will be referred to hereinafter as “the 13 claimants”).
24. (a) At the suggestion of counsel for some of the 13 claimants, counsel for all the parties to the interpleader action agreed orally:
(1) that the amounts due the 13 claimants were the amounts set forth opposite their names in the column designated “Amount due supplier” in the table that is contained in finding 14(a) ;
(2) that the principal amount of the claim of APC on the Tyler bond did not exceed the sum of $24,288.81;
(3) that any of the 13 claimants that so desired could receive from Continental, in return for a receipt and release and an assignment of the supplier’s claim, its pro rata share of the principal amount of the Tyler bond, determined in the maimer described subsequently in this finding; and
(4) that in determining what APC and any remaining claimants would be entitled to receive upon ultimate disposition of the APC claim at a figure lower than $24,288.81, the claims of the 13 claimants would be taken at the “Amount due supplier” figures in finding 14(a) rather than at the claimants’ pro rata shares.
(b) In determining the pro rata share of each claimant, the claims of the 13 claimants were taken at the “Amount due supplier” figures in finding 14(a) and the APC claim, was treated as being in the amount of $24,288.81. The principal of the Tyler bond, $45,500, was then allocated among these 14 claims (i.e., the claims of APC and the 13 claimants) on the basis of those amounts in order to get each claimant’s pro rata share. Eleven of the 13 claimants (excluding Haenn Ship Ceiling & Refitting Corp. and The Farboil *175 Company) indicated a desire to receive their pro rata shares on this basis.
(c) In implementation of the oral agreement previously mentioned in this finding, the remaining parties in the in-terpleader action, consisting of Haenn Ship Ceiling & -Refitting Corp., The Farboil Company, APC, and Continental, executed and delivered a written agreement dated September 25,1953.
(d) Simultaneously with the delivery of the agreement of September 25, 1953, the 11 of the 13 claimants that desired to receive their pro rata shares of the Tyler 'bond executed and delivered to Continental receipts and releases and assignments of their claims, as mentioned in finding 14(b), and Continental paid these claimants the amounts set forth opposite their names in the column headed “Amount paid by Continental” in the table that is contained in finding 14(a).
(e) It was not considered necessary to have the 11 of the 13 claimants that desired to receive their pro rata shares of the Tyler bond join in the agreement of September 25, 1953, because their execution and delivery of the receipts and releases and assignments terminated their interest in the matter.
25. (a) The interpleader action, together with the civil actions Nos. 14213 and 14274 brought by APC, were tried before Judge William H. Kirkpatrick, sitting without a jury, on May 11-12,1955. APC had advanced money which was used to pay payrolls of Pennsylvania Drydock, and, in summary, APC claimed that it was entitled to assert the rights of the employees of Pennsylvania Drydock for labor performed, either on the theory of equitable assignment or on the theory of equitable subrogation. Continental defended on the ground that APC had loaned the money in question to Pennsylvania Drydock and, therefore, was a mere general creditor of Pennsylvania Drydock. The remaining parties to the interpleader action entered into a stipulation of some of the facts. In his testimony at the trial, the president of APC admitted that he advanced the money to meet payrolls pursuant to an agreement with the principal stock *176 holder of Pennsylvania Drydock whereby the president of APC was to receive a 50-percent interest in Pennsylvania Drydock and the right to manage Pennsylvania Drydock. The president of APC further testified that he was interested in keeping Pennsylvania Drydock going because it had the only drydock in the port of Philadelphia which ship-repair firms, such as Pennsylvania Drydock and APC, could use. APC relied upon testimony concerning certain conversations between its president and the business manager of the union to which the employees of Pennsylvania Drydock belonged; and it was claimed that, as a result of these conversations, APC was entitled to assert the rights of the employees of Pennsylvania Drydock.
(b) On August 8, 1955, Judge Kirkpatrick filed an opinion supporting the claims of APC.
26. (a) Before any judgment was entered on the opinion of Judge Kirkpatrick mentioned in finding 25(b), and while Continental was considering the taking of an appeal from any judgment that might be entered thereon, discussions of possible settlement were undertaken by counsel for Continental, APC, Haenn Ship Ceiling & Befitting Corp., and The Farboil Company. As a result of those discussions, APC and Continental entered into an agreement dated November 29, 1955, which settled the claims of APC on the Tyler and King bonds.
(b) Pursuant to the agreement of November 29, 1955, Continental paid to APC the sum of $11,733.50 on account of APC’s claim on the Tyler bond and $13,266.50 on account of APC’s claim on the King bond, as indicated in finding 16(a). The figures were arrived at by dividing the sum of $25,000, which the parties had agreed upon as the cash payment in the settlement of the claims of APC on the Tyler and King bonds, in the ratio of the amount of money which APC had advanced and which was used to pay for labor performed in connection with the repairs to the S.S. Franklin H. King, i.e., $21,622.92, and the amount of money which APC had advanced and which had been used to pay for labor performed in connection with repairs to the S.S. William Tyler, i.e., $24,288.81, but reduced as set forth in *177 the agreement of September 25, 1953 (see finding 24) to $19,124.29 by reason of the fact that the claims on the Tyler bond exceeded the principal amount thereof. The payment on the Tyler bond of $11,733.50 represented 61.35 percent of the maximum principal amount which APC could have recovered on the Tyler bond under the agreement of September 25, 1953, which amount was $19,124.29.
(c) Because the contemplated appeal involved additional expense and the usual uncertainties, and because both Haenn Ship Ceiling & Befitting Corp. and The Parboil Company stood to gain or lose with Continental depending upon the outcome of such an appeal, both Haenn Ship Ceiling & Befitting Corp. and The Farboil Company agreed, as part of the overall settlement of the interpleader action and the claims of APC against Continental, to settle their claims on the Tyler bond for their pro rata shares of the principal of the Tyler bond, as set forth in the agreement of September 25, 1953, plus 61.35 percent of the difference between that amount and the principal amounts of their claims. Simultaneously with the execution and delivery of the agreement of November 29,1955, between APC and Continental, Haenn Ship Ceiling & Befitting Corp. and The Farboil Company agreed to settle their claims on the basis indicated in this paragraph; and payments to these two claimants pursuant to that agreement were made as set forth in finding 14(a).
27. (a) In addition to the payments that are referred to in the first sentence of finding 26(b), Continental also agreed, in the agreement of November 29, 1955, subject to the terms and conditions set forth in the agreement, to pay to APC the first $10,000 of any salvage which Continental might recover by reason of losses sustained as a result of payment and performance bonds written for Thomas S. Lee (the principal officer and stockholder of Pennsylvania Dry-dock) and for Pennsylvania Drydock.
(b) The obligation of Continental to pay to APC the additional $10,000 mentioned in paragraph (a) of this finding was discharged by means of a multi-party agreement dated October 20,1960. Under the terms of that agreement, certain parties were to pay $115,000 in settlement of the *178 separate claims of APC and Continental arising out of tbe transactions of Thomas S. Lee and Pennsylvania Drydock. The first $40,000 was to be paid to APC, and Continental was to receive the balance of $75,000 only after APC had been paid.
28. (a) Although Walter Kidde & Co., Inc., had presented a claim on the Tyler bond to Continental prior to October 1, 1952, it failed to institute any suit on that claim because of a misunderstanding on the part of its counsel as to the position of Continental following the civil actions brought by APC on October 1, 1952 (see finding 22(a)). Upon the final disposition of the interpleader action (see findings 23-27), Continental paid Walter Kidde & Co., Inc., the sum of $613.08, which represented 78 percent of its claim. Accepting the APC claim at $24,288.81 and the amounts due the 13 claimants at the principal amounts thereof set forth in the column headed “Amount due supplier” in the table that is contained in finding 14(a), each of the claimants would have been entitled to approximately 78 percent of his claim, and it was because of this that the 78-percent figure was used in disposing of the claim of Walter Kidde & Co., Inc.
(b) The claim of M. A. Bruder & Sons, Inc., on the Tyler bond had been paid in full prior to the assertion of the APC claim and was overlooked in the interpleader action.
(c) Joseph S. Carlitz had instituted a suit against Continental on the Tyler bond. Through inadvertence, the suit papers were not forwarded to counsel for Continental, and Joseph S. Carlitz’s counsel, who represented several of the 13 claimants on the Tyler bond, did not call the Carlitz suit to the attention of counsel for Continental until after the settlement with the 11 claimants, as described in finding 24. The $218 ultimately paid to Joseph S. Carlitz represented approximately 78 percent of his claim, on the same basis that is mentioned in paragraph (a) of this finding.
29. (a) The trustees contend that the defendant is indebted to them in the total amount of $57,399.93 that is unpaid on the following accounts:
*179 For repair of U.S.S. Wilkes Barre (8-30-51 to 1-17-52)
under contract NObs 10974 — ■
'Contract price_$57, 916.32
Amount paid_ 53,866.32
Balance unpaid_ 4,050.00
For repair of U.'S.S. Cleveland (8-30-51 'to 3-18-52) under contract NObs 10974—
Contract price_ 210, 883.95
Amount paid_ 194,666.35
Balance unpaid_ 16,217.60
For taking inventory at direction 'of Public Works Officer,
Building #1, Philadelphia Naval Base_ 3,372.28
For repair of S.S. Cape Fair Weather (2-16-52 to 5-14-52)—
Contract price- 173,182.00
Amount paid-151,318. 95
Balance unpaid_ 21,863.05
For repair of Army Corps of Engineers Vessel Gulfport
(2-25-52 to 3-28-52)_ 10,467.00
For Thiekol cover on U.S.S. Cleveland, directed by authorized representatives of the Department of the Navy_ 1,430.00
(b) The defendant has withheld payment on the accounts referred to in paragraph (a) of this finding on the basis of a counterclaim for “Use and Occupancy” of Navy facilities in Philadelphia, Pennsylvania. The counterclaim is disputed by the trustees.
(c) The evidence in the record is insufficient for a determination of the validity of the claims and counterclaim referred to in paragraphs (a) and (b) of this finding.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff Continental Casualty Company is entitled to recover in the amount of twenty-six thousand nirm hundred four dollars and thirty-seven cents ($26,904.37), and judgment is entered to that effect.
*180 The claim of Edward J. Breen, et al., trustees in bankruptcy of the Pennsylvania Drydock & Shipbuilding Co., Inc., is dismissed.