## UNITED ELECTRIC CORPORATION

### v.

### The UNITED STATES.

### No. 10–80C.

United States Court of Claims.

April 22, 1981.

John F. Taylor, San Francisco, attorney of record, for plaintiff.

John Charles Ranney, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## ON DEFENDANT'S MOTION TO DISMISS

DAVIS, Judge:

We are faced, once again, with the uneasy problem of whether a subcontractor has standing to sue the United States for compensation due it under a subcontract with a government contractor where both the prime and the surety have failed or refused to make the payment, and the Government retains funds owing on the contract. This time the question arises on the following claim (as asserted in the petition): In 1978, plaintiff United Electric Corporation (United) made a contract with Standard Conveyor Co. (Standard) to supply over $100,000 worth of electrical components which were to become part of a mechanized materials-handling system that Standard contracted with the United States Air Force to fabricate, test and install at McClellan Air Force Base. The Air Force required Standard to post a payment bond of $494,665.50 under the Miller Act, 40 U.S.C. § 270a, an amount which United alleges was legally inadequate. Plaintiff says it performed its contractual obligations but did not receive payment from Standard which had filed a petition in bankruptcy in 1979, and is allegedly unable to pay. Unit-

ed then attempted to recover its compensation from Standard's surety, but the surety also refused compensation on the ground that the bond did not cover the materials provided by plaintiff.[1] However, plaintiff alleges the Government still retains a percentage of the contract in an amount ($550,000) much greater than United's demand ($107,958.42).

Plaintiff seeks judgment in this court from the United States for its contract price, asserting that the Air Force acted negligently and failed to comply with the requirements of the Miller Act, thus creating an equitable lien in United's favor on contract retainages (or other funds which should have been but were not retained by defendant). Defendant has moved to dismiss the petition, saying that the subcontractor has no claim within this court's jurisdiction.

The obvious difficulty for plaintiff is that the full court has already decided, in a comparable context, that we cannot entertain a subcontractor's claim which the prime (or a higher sub) and the surety have not paid. *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973) *(USF&G)*. There, the Miller Act surety had fully met its obligations under the payment and performance bonds, but certain laborers and materialmen remained unpaid. The surety and the unpaid subcontractors sued here, raising claims against contract retainages in the hands of the Government, and also alleging improper progress payments. The Government claimed priority to the retained funds on the basis of a tax lien and other unmet obligations owing to it by the prime contractor. After satisfaction of these debts, approximately $4,000 in unexpended contract funds remained—an amount far smaller than that still owed to the subcontractors. On these facts we held that (1) the surety did not have priority against the United States for amounts necessary to satisfy tax and other obligations running from the prime to the Government; (2) the surety could not share in unexpended sums retained under the contract because it had not fully paid all of the laborers and materialmen (although it had completely satisfied its payment bond obligation to them); and (3) the subcontractors did not have standing to sue the United States on their own behalf.

The *USF&G* issue which is now critical concerns the last of these holdings—the right of subcontractors to sue the United States directly for their compensation. Relying on precedent from this court as well as the Supreme Court, we ruled specifically that such a right does not exist. This en banc holding is of course, binding on this panel.[2] But we can ask the full en banc court to reconsider that decision if we now think it wrong or questionable. We heard oral argument on the present case because a post-*USF&G* ruling of the Tenth Circuit could be thought to undermine our decision in *USF&G* (and is so presented by United). *Kennedy Electric Co. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974). Because of *Kennedy*, which United emphasizes strongly, we have recanvassed the ground and now conclude that that case is quite distinguishable and that we have no reason to question *USF&G*.

In *Kennedy*, an electrical subcontractor which had performed work on a building for the Post Office Department (predecessor to the United States Postal Service) brought suit against the Postal Service for its compensation. That claimant had not been paid for its labor and materials because the prime had become insolvent and no Miller Act bonds had been posted. The Tenth Circuit, affirming a district court judgment in plaintiff's favor, held that the subcontractor had an equitable lien on contract retainages and amounts which had been improperly paid to the contractor's

---

1. While the surety has refused to make payment, it has not yet been judicially determined that the surety is free from liability to United. Plaintiff has filed suit against the surety which is now pending in U.S. District Court.

2. Plaintiff makes no attempt to distinguish *USF&G* and we discern no basis for doing so.

assignee in violation of Postal Service regulations.

*Kennedy* is quite different from both *USF&G* and the present case on a crucial point. In *Kennedy* the Postal Service, rather than the United States, was the defendant. The Postal Service is an independent establishment with the general capacity (given it by Congress) to "sue and be sued," *see* 39 U.S.C. § 401,[3] not a subordinate unit of the Federal Government like the Air Force. In *Kennedy,* therefore, there was no bar of sovereign immunity to the subcontractor's suit, and the Postal Service was found to be "just as amenable to the judicial process as is a private enterprise." *Id.* at 957, 960. *See also, F.H.A. v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940). Indeed, while discussing our decision in *USF&G,* the *Kennedy* court specifically stated:

> *USF&G* is a different case from that at bar. We do not have a standing question. Our suit is against an independent establishment having the power to sue and be sued. [508 F.2d at 959.]

The broad, unlimited legislative declaration that the Postal Service could "be sued" left the Tenth Circuit free to apply doctrines applicable to private persons, including principles of restitution, tort-law, and "contracts implied in law," and thereby to conclude that the equities of that subcontractor were paramount to those of the Postal Service, and that "[i]n like circumstances a private enterprise could not take advantage of the misconduct of its transferor." 508 F.2d at 960.

■ The foundation of *USF&G,* to the contrary, is that suit here against the United States under 28 U.S.C. § 1491 is not unlimited and does not put the United States on the same plane, in all respects, as if it were a private entity. The controlling axiom is that the United States may be sued only to the extent that it allows its sovereign immunity to be waived. Through 28 U.S.C. § 1491, the United States has consented to be sued for money damages in certain restricted circumstances, the only relevant one being on the basis of a contract (either express or implied-in-fact) between the United States and the claimant.[4] In the absence of a direct contractual link (express or implied in fact), no enforceable contractual right against the United States exists, and therefore a subcontractor, in privity only with its private prime, cannot recover directly from the Government for amounts owed it by the prime. *Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 8, 479 F.2d 1334, 1337 (1973).[5] This requirement of privity of contract is one important basis for the statement in *United States v. Munsey Trust Co.,* 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), that "nothing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation." *Id.* at 241, 67 S.Ct. at 1602 (citing *H. Her-*

---

**3.** Section 401 granted the Postal Service a number of broad, general powers including the authority "to sue and be sued in its official name," and "to enter into and perform contracts * * *." 39 U.S.C. § 401(1), (3).

**4.** It is plain that the Miller Act itself does not mandate compensation by the United States to a subcontractor within the coverage of 28 U.S.C. § 1491 (*cf. United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)) and that plaintiff has no claim directly under the Miller Act for relief from this court. Plaintiff makes no contrary contention.

**5.** This court has long followed the general rule that subcontractors (without a contractual arrangement with the Government) cannot themselves sue in this court on their contracts. *See, e. g., H. Herfurth, Jr., Inc. v. United States,* 89

Ct.Cl. 122, 127 (1939) (note 6, *infra); Severin v. United States,* 99 Ct.Cl. 435, 442 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944).

Moreover, we have no original jurisdiction over tort claims and we have no authority over so-called contracts implied-in-law which are based merely on equitable considerations. *United States v. Minnesota Investment Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 503, 70 L.Ed. 911 (1926). "The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law." *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925).

*furth, Jr., Inc. v. United States,* 89 Ct.Cl. 122 (1939)).[6]

The *USF&G* court relied on this *Munsey* language in reaching its conclusion of no standing for subcontractors. In *Munsey* a surety and the United States both asserted a right to contract retainages. The surety had paid off laborers and materialmen and was seeking reimbursement of such payment through subrogation to the rights of the subcontractors against the Government. The Supreme Court said (among other things) that subrogation did not help the surety because the materialmen and laborers had no enforceable rights against the Government and that "one cannot acquire by subrogation what another whose rights he claims did not have." 332 U.S. at 241–42, 67 S.Ct. at 1602–03.[7]

We recognized in *USF&G* that there was a possible contradiction between *Munsey* and the later Supreme Court statement in *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), on the standing question. In *Pearlman* the contractor defaulted and the surety paid the laborers and materialmen. Both the surety and the contractor's trustee in bankruptcy sought to obtain the contract retainages. *Pearlman* recognized an equitable obligation of the Government to see that laborers and materialmen are paid.[8] It stated that:

We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; *that the laborers and materialmen had a right to be paid out of the fund*; that the contractor had he completed his job and paid his laborers and materialmen, would have been entitled to the fund; *and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.* [371 U.S. at 141, 83 S.Ct. at 237 (emphasis added).]

The tension between *Munsey* and *Pearlman* emerges from the assertion in *Munsey* that "nothing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation," 332 U.S. at 241, 67 S.Ct. at 1602, and the different *Pearlman* language that "laborers and materialmen had a right to be paid out of the fund," a right which the surety "is entitled to the benefit of * * * to the extent necessary to reimburse it," 371 U.S. at 141, 83 S.Ct. at 237. What concerned us in *USF&G* about these two positions is that "[i]t is a short

---

**6.** We held in *Herfurth* that "[i]t is apparent that the contract was between the defendant and Stetson [the prime contractor], and plaintiff was a subcontractor under a written contract with Stetson. * * * There was no contractual right, expressed or implied, between the plaintiff and the defendant. Plaintiff possessed no privity of contract with the defendant." 89 Ct.Cl. at 127.

**7.** The Supreme Court did not have to reach the issue of what claim the subcontractors would have had if both the surety and contractor failed to pay them, and specifically declined to decide that question. 332 U.S. at 242, 67 S.Ct. at 1603.

**8.** In holding for the surety in *Pearlman,* the Court invoked the pre-*Munsey* case of *Henningsen v. United States Fidelity and Guaranty Co.,* 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), which held that a surety, which had to pay materialmen on a payment bond as a result of the contractor's default, had rights superior to those of an uninvolved third party (a bank which had loaned money to the contractor, the loan security being assignment of amounts due under the contract), because the surety had

paid the laborers and materialmen and thus released the contractor from his obligations to them, and to the same extent released the Government from all equitable obligations to see that laborers and supplymen were paid. [208 U.S. at 410, 28 S.Ct. at 391.]

With respect to the issue of whether the holding in *Henningsen* had been overruled by *Munsey,* the *Pearlman* Court observed:

The point at issue in that case [*Munsey*] was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the Government could exercise the well-established common law right of debtors to offset claims of their own against their creditors. This is all we held. * * * *Munsey* left the rule in * * * *Henningsen* undisturbed. [371 U.S. at 140–41, 83 S.Ct. at 236–37.]

step from *Pearlman* to infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly * * *." 201 Ct.Cl. at 10, 475 F.2d at 1382. But to allow that would result in a conflict with *Munsey. Id.* at 10, 475 F.2d at 1382. *See also, Pearlman, supra,* 371 U.S. at 142, 83 S.Ct. at 237 (concurring opinion of Justice Clark).

We reconciled the *Munsey* and *Pearlman* comments when we said that

the Court in *Pearlman* stated that the surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant. [*Id.* at 10, 475 F.2d at 1382 (emphasis in original).]

Under this interpretation, *Pearlman* does not conflict with *Munsey* because, while the surety gains equitable rights from its subrogation to the subcontractors' claims, its standing to sue (its ability to *enforce* those rights and others) comes from the fact that it is also subrogated to, and stands in the shoes of, the contractor, an entity which is clearly in privity of contract with the Government. *Id.* at 10, 475 F.2d at 1382. *See Pearlman, supra,* 371 U.S. at 143, 83 S.Ct. at 238 (concurring opinion) (alternative suggestion as to surety's position). But the existence of equitable rights in subcontractors (as well as other laborers and materialmen) does not mean that they, too, can sue the United States directly for their part of the retained funds—perhaps unfortunately, Congress has not consented to that class of suit and the subs' right remain unenforceable against the United States under the Tucker Act.

We continue to see our position in *USF&G* as a reasonable reading of the somewhat ambiguous language in *Pearl-*

*man.* As *USF&G* pointed out, while the Supreme Court and prior lower court cases dealt with questions of priority to funds held by the Government,

[n]one have involved a plaintiff-subcontractor directly asserting a claim to money held by the Government. *The subcontractors do possess equitable rights to the retained funds* vis-a-vis other claimants to the money, *but their rights * * * do not necessarily include or imply a right in the subcontractor itself to sue the Government.* [*Id.* at 10–11, 475 F.2d at 1382 (emphasis added).]

*See, also, Continental Casualty Co. v. United States,* 164 Ct.Cl. 160 (1964), in which we said that "[t]he United States had the right to use the money in its hands to pay laborers and materialmen [citing *Pearlman* ], but the laborers and materialmen could not force it to do so [citing *Munsey]."* Id. *at 162–63.* This analysis foreshadowed, in capsule form, our views in USF&G.

The Tenth Circuit's *Kennedy* opinion questions the *USF&G* reconciliation of the *Munsey* and *Pearlman* statements:

More importantly the effort in *USF&G* to reconcile Munsey and Pearlman does not convince us. Munsey says that it does not decide whether subcontractors have any claim to retainage if both contractor and surety fail to pay. Pearlman says that Munsey held only that the Government could exercise its set-off right. Accordingly there is nothing to reconcile. [508 F.2d at 959 (citations omitted).]

The *Kennedy* court may have thought that we saw conflicting *decisions* in the two Supreme Court cases. But that was not the point of our concern; the two *decisions* were obviously reconcilable in result (as *Kennedy* points out). Our focus was, rather, on contrasting statements in the two opinions which do present somewhat of a problem, and our effort was to see if they could be harmonized (the two statements are, after all, in Supreme Court opinions). On that precise topic, *Kennedy* throws no light, nor does it suggest to us either that our reading of the Supreme Court's opin-

ions is incorrect or that the statements in those opinions are truly in conflict.

We add that, even if our understanding in *USF&G* (and in the present opinion) of the Supreme Court's statements is incorrect or unconvincing, that would make no difference in our ultimate conclusion which rests, at bottom, squarely on the limitations on this court's jurisdiction imposed by 28 U.S.C. § 1491. *See* the discussion, *supra*. These restrictions have been recognized and implemented, not only in *USF&G*, but in the cases in this court declaring that subcontractors, without a contractual relationship with the Government, cannot sue either in general or specifically for contract retainages. *See, e. g., Herfurth, supra*, 89 Ct.Cl. at 127; *Continental Casualty, supra*, 164 Ct.Cl. at 162–63; *Putnam Mills, supra*, 202 Ct.Cl. at 8, 479 F.2d at 1337.

It follows that we have no reason to question *USF&G*, and that under it and established principles in this court United has no standing to sue the United States for recovery of its compensation.[9] This is the conclusion mandated, we think, by the Tucker Act (as it stands today) but it is not a happy result if United ends up without payment to which it is entitled and for which contract money is available from the Government. As we have done before, we stress that the United States may voluntarily choose to make payment, *see Continental Casualty, supra*, 164 Ct.Cl. at 162–63; *USF&G, supra*, 201 Ct.Cl. at 10, 475 F.2d at 1382, and we believe that it has a nonenforceable obligation to do so, when and if it becomes clear that United had a valid claim, that contract retainages or other unexpended funds under the contract are available for such payment, and that, if those funds are not paid out, the Government will be receiving a windfall which it should not have. *Cf., USF&G, supra*, 201 Ct.Cl. at 12, 475 F.2d at 1383. The Government should not "retain both the benefits of

the contract and the funds that were to be used to pay for them." *Id.* at 11, 475 F.2d at 1383.

Defendant's motion to dismiss the petition is granted and the petition is dismissed.

the court, and in any event such a solution is not available in the current case. Plaintiff United is the only suing party and there is no other plaintiff to whose presence we could hitch a third-party notice to plaintiff.

---

9. In *USF&G* the writer of the present opinion suggested separately, 201 Ct.Cl. at 18, 475 F.2d at 1387, that those subcontractor plaintiffs should be treated as noticed in as third-parties under Rule 41(a)(1), and granted recovery in that way. This position was not accepted by