**INSURANCE COMPANY OF THE WEST, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–124C.**

United States Court of Federal Claims.

March 11, 2003.

Robert M. Wright, Baltimore, MD, for plaintiff. Gerard P. Sunderland, Whiteford, Taylor & Preston, of counsel.

Doris S. Finnerman, Washington DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. LTC Blane B. Lewis, United States Air Force, of counsel.

## OPINION

MILLER, Judge.

Plaintiff seeks summary judgment, claiming entitlement to three payments wrongfully made by the Government to a defaulted contractor bonded by plaintiff. Defendant moves to dismiss, or, alternatively, for summary judgment, based, *inter alia,* on lan-

guage from a Federal Circuit opinion that calls into question a surety's ability to sue the United States under the theory of equitable subrogation. Argument is deemed unnecessary.

## FACTS

The facts, unless otherwise noted, are undisputed, and are drawn from the complaint, the parties' motions and proposed findings of fact, and the court's order certifying a question for interlocutory review. *See Insurance Co. of the West v. United States*, No. 99–124C, 1999 U.S. Claims LEXIS 313 (Fed.Cl. Dec.10, 1999) (*"West I"*).

### 1. *Factual background*

On August 28, 1997, the United States Air Force (the "Air Force") awarded contract No. F64605–97–C–0013, to P.C.E. Ltd. ("PCE"), for the replacement of automatic doors in the commissary at Hickam Air Force Base, Hawaii. On September 4, 1997, surety Insurance Company of the West ("plaintiff"), in accordance with the Miller Act, 40 U.S.C. § 3131 (2003), executed both performance and payment bonds to secure the contract.

By letter of November 21, 1997, Michael Braum, PCE's President, notified the Air Force that PCE was financially unable to complete its ongoing construction contracts. The letter stated that plaintiff would assure completion of projects on which it had issued payment and performance bonds and that PCE would assist plaintiff in completing the outstanding contracts. Mr. Braum directed that "all contract funds currently remaining due, inclusive [of] the amounts due under the most recent unpaid application for payment," be paid to plaintiff, care of Cynthia J. Vincent, Surety Claims Manager, at plaintiff's offices in San Diego, CA.

Upon receipt of PCE's letter, Caroline K. Ponce, the contracting officer assigned to the contract, spoke with "Derek," an otherwise unidentified PCE employee, to determine the status of the project. According to her Memorandum for Record dated November 24, 1997, Derek informed Ms. Ponce that no work thus far had been performed on the project, and Ms. Ponce responded that PCE should pursue one of two courses to expedite its completion: 1) issue an "Assignment of Claims which is just for payment purposes," or 2) execute a formal takeover agreement with plaintiff. The employee agreed to speak with plaintiff's president, Mr. Braum, to determine which avenue to pursue.

On December 4, 1997, Brian R. Sawyer, Surety Claims Analyst for plaintiff, confirmed by letter the substance of PCE's November 21, 1997 correspondence and reiterated that "all payments due on the referenced contract [should] be made payable to [plaintiff]" and mailed to plaintiff's San Diego address. On December 18, 1997, Contracting Officer Ponce forwarded to Ms. Vincent of PCE a copy of the Federal Acquisition Regulation governing the procedure for assigning claims. *See* 48 C.F.R. (FAR) § 32.805 (2003). Although plaintiff did not execute a formal assignment agreement with PCE, the parties dispute why this did not occur.[1]

Mr. Braum, on January 28, 1998, again wrote to the Air Force, reiterating plaintiff's request that the remittance should be sent to plaintiff's San Diego office. He directed that all other paperwork and contractual documents be sent to PCE's Honolulu, Hawaii office. The next day, January 29, 1998, the Air Force issued Modification No. P00002 to the contract, changing the remittance address on the contract to "PCE [ ] c/o Insurance Company of the West; 11455 El Camino Real; San Diego, CA 91230–2045."

Thereafter, PCE completed the work required by the contract,[2] with plaintiff financing PCE's performance from approximately

1. Plaintiff maintains that it could not serve as an assignee of contract funds because a surety does not qualify as a financial institution for the purposes of the Assignment of Claims Act of 1940. *See* 31 U.S.C. § 3727 (2003); 41 U.S.C. § 15(b) (2003). The court does not address this contention in this opinion, as it has no bearing on the outcome of the cross-motions.

2. The parties have not furnished the court with the exact date of the Air Force's acceptance of PCE's performance, and plaintiff disputes that PCE completed performance owing to its inability to pay its subcontractors and insurance bills without plaintiff's assistance.

January 9, 1998, to May 28, 1998.[3] PCE submitted three invoices to the Air Force for its performance costs: The first invoice, dated January 20, 1998, totaled $93,960.00, and was paid by check dated February 13, 1998; the second invoice, dated April 3, 1998, totaled $76,560.00, and was paid by check dated May 12, 1998; and the third invoice totaled $3,480.00, and was paid by check dated July 6, 1998.[4]

On May 29, 1998, Mr. Braum of PCE executed a release with the United States Government, absolving the Government of liability for all claims arising from the contract, with the exception of patent reimbursement costs and claims "based upon the liabilities of the Contractor to third parties arising out of the performance of the ... contract, which are not known to the Contractor on the date of the execution of this release." The consideration for the release was $174,000.00, i.e., the contract price.

On December 22, 1998, plaintiff notified the Air Force in writing that it had not received any payments under the contract. Contracting Officer Ponce responded by letter of January 26, 1999, explaining that because Modification No. P00002 had not been received by the Columbus, Ohio disbursement office, all three checks were issued directly to PCE. As the payments already had been issued to PCE, Ms. Ponce advised plaintiff to contact PCE to resolve the error.

On January 29, 1999, plaintiff simultaneously filed suit against PCE in the United States District Court for the District of Hawaii and moved for a prejudgment attachment of the funds in PCE's bank account. The attachment motion was granted, and a portion of the disputed funds, by order of February 12, 1999, were deposited with the clerk of the court. On July 24, 2001, the parties agreed to dismiss plaintiff's claims against PCE without prejudice, on the condition that all deposited funds, including any accrued interest, be released to plaintiff. The parties dispute whether any of the released funds represents payments made to PCE under the contract at issue, and whether plaintiff applied the recovered funds against losses incurred under the subject contract.

After filing suit against PCE, plaintiff, on March 11, 1999, filed a complaint in the United States Court of Federal Claims. Plaintiff sought $174,000.00,[5] the amount paid directly to PCE, plus costs and interest, from the United States, under the theory that the Government wrongfully disbursed the funds to PCE despite notice from both PCE and plaintiff that all contract retainages were to be submitted directly to plaintiff.

### 2. *Procedural history*

Defendant moved on June 9, 1999, to dismiss plaintiff's complaint for lack of subject matter jurisdiction under RCFC 12(b)(1). The court denied defendant's motion on August 11, 1999. Defendant then moved for certification of an interlocutory appeal, contending that the Supreme Court's decision in *Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999), had extinguished the Court of Federal Claims's jurisdiction to hear claims brought by sureties under the doctrine of equitable subrogation. Defendant argued that *Blue Fox* stood for the proposition that the United States had not waived its sovereign immunity against such claims under the Tucker Act, 28 U.S.C. § 1491(a) (2003). Recognizing that the Federal Circuit in *Balboa Insurance Co. v. United States,* 775 F.2d 1158, 1161 (Fed. Cir.1985), explicitly had held that a surety may assert the doctrine of equitable subrogation in the Claims Court and that *Balboa* was undergirded by years of decisions from the Federal Circuit and the Court of Claims reiterating the same holding, the court granted defendant's motion on December 10, 1999,

---

3. Defendant concedes, only for the purposes of its motion, that payments made by plaintiff during this period were for expenses incurred under the contract.

4. The third invoice is dated December 19, 1997, which, in light of the chronology of earlier payments, cannot be the correct date. Defendant's records indicate that the third invoice was certified for payment by Contracting Officer Ponce on June 2, 1998.

5. In its September 10, 2002 motion for summary judgment, plaintiff seeks to recover only $124,443.71, representing the alleged loss on its performance bond.

and certified to the Federal Circuit a question regarding the effect of *Blue Fox* on the court's jurisdiction to hear surety claims premised on equitable subrogation.[6] *West I* at \*10.

The Federal Circuit addressed the certified question in its March 23, 2001 opinion. *See Insurance Co. of the West v. United States,* 243 F.3d 1367 (Fed.Cir.2001) ("*West II*"). While observing that there is no privity of contract between the Government and a surety,[7] the court recognized that sureties have "traditionally asserted claims against the government under the equitable doctrine of subrogation. This approach dates back at least to 1896 ...." *West II* at 1370. The court then analyzed *Blue Fox* and concluded that the case stood for nothing more than the proposition that " 'sovereign immunity bars subcontractors and other creditors from enforcing liens on Government property or funds to recoup their losses.' " *Id.* at 1371 (quoting *Blue Fox,* 525 U.S. at 265, 119 S.Ct. 687).

The *Blue Fox* Court ruled that three Supreme Court cases, relied on by the Federal Circuit in *Balboa* in holding that the United States had waived sovereign immunity as to equitable subrogation claims by sureties, did not address the issue of sovereign immunity. *West II* at 1372. Thus, the Federal Circuit looked to another Supreme Court case, *United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949), in which the Court analyzed the intersection of subrogation and sovereign immunity. In *Aetna* the Court concluded that the United States had waived its sovereign immunity as to claims brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (the "FTCA"), by insurance companies subrogated to the rights of their insureds. 338 U.S. at 383, 70 S.Ct. 207. The Federal Circuit noted that the language of both the

Tucker Act and the FTCA "contains an unequivocal expression waiving sovereign immunity as to claims, not particular claimants" and that, as long recognized in common law, the assignee of a claim steps into the shoes of an assignor and holds all of the assignor's rights. *West II* at 1374–75. According to the Federal Circuit, the Supreme Court consistently has assumed that the waiver of sovereign immunity in the Tucker Act extends to assignees, and, if sovereign immunity barred claims by subrogees, no need would have arisen for the Anti–Assignment Act. *Id.* at 1374.

This reasoning led the Federal Circuit to conclude that "*Aetna* reflects a broader and more generally applicable principle: waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments ... where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant." *West II* at 1373. In sum, the Tucker Act waives sovereign immunity for assignees, "and thus sovereign immunity presents no barrier" to a claim by a subrogee surety against the United States. *Id.*

Having surmounted this jurisdictional hurdle, plaintiff now seeks summary judgment that the Government is liable for payments made to PCE. Defendant responds with a motion to dismiss the complaint for failure to state a claim upon which relief can be granted or, alternatively, a cross-motion for summary judgment, arguing that plaintiff's claim is precluded by the affirmative defenses of payment and release. Defendant also challenges whether plaintiff was subrogated to PCE when the Government made the progress payments and contends that plaintiff's claim must be offset by monies received from PCE in the district court litigation.

*West I* at \*4.

---

**6.** This court certified the following question to the Federal Circuit:

Whether, as recognized by the Federal Circuit in *Balboa,* the United States has waived sovereign immunity for the equitable subrogation claims of a surety against the United States, in light of the Supreme Court's recent holding in *Blue Fox,* and, if not, whether jurisdiction for such a claim can be predicated on a surety's status as a third-party beneficiary.

**7.** The Federal Circuit did not address the third-party beneficiary issue directly, apparently deferring to precedent that a surety is not a third-party beneficiary of the contractual relationship between a contractor and the Government. *See, e.g., National Sur. Corp. v. United States,* 118 F.3d 1542, 1545 (Fed.Cir.1997).

## DISCUSSION

I. *Motion to dismiss*

Defendant presents several arguments to warrant dismissal under RCFC 12(b)(6), for failure to state an actionable claim. A crucial premise to each argument is the Federal Circuit's conclusion that a subrogee enjoys only the rights of the subrogor, with any advantages or disadvantages that those rights may entail, and is subject to the same defenses that could have been brought against the subrogor. Defendant contends that plaintiff cannot claim the contract price for three reasons. First, the United States, in paying PCE the entire contract price of $174,000.00, has discharged completely its duties under the contract, thereby nullifying plaintiff's claim. Second, it points to the release executed by PCE after receipt of the contract payments, and argues that "[a]s PCE would be bound by its release of claims against the Government, so [plaintiff] must be bound by the release." Def.'s Br. filed Oct. 7, 2002, at 11. Third, the *West II* decision purportedly prevents plaintiff from asserting PCE's rights in this case, as defendant reads the decision as limiting sureties to asserting only the rights that subcontractors, and not contractors, have against the Government.[8] As defendant's third argument presents the most novel and difficult issue, it will be addressed first.

1. *The impact of West II on the scope of equitable subrogation*

Plaintiff argues that *International Fidelity Insurance Co. v. United States,* 41 Fed.Cl. 706 (1998), and *Transamerica Premier Insurance Co. v. United States,* 32 Fed.Cl. 308 (1994), support a grant of its motion. In both cases the Government was found liable to the surety for payments that the Government issued wrongly to the contractor after the Government was on notice of the contractor's financial inability to complete the contract. *International Fid.,* 41 Fed.Cl. at 719; *Transamerica Premier,* 32 Fed.Cl. at 316–17.

In order to assert their claims against the Government, plaintiff sureties first settled the amounts due to the subcontractors and then, under the doctrine of equitable subrogation, stepped into the shoes of the contractors and brought suit directly against the Government. *International Fid.,* 41 Fed.Cl. at 711–12; *Transamerica Premier,* 32 Fed. Cl. at 312.

Defendant argues that a paragraph in *West II* nullifies plaintiff's primary authority in its summary judgment motion. The Federal Circuit stated:

> It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government.

*West II* at 1371 (citing *United States v. Munsey Trust Co.,* 332 U.S. 234, 240–41, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947)). This language was the subject of motions by plaintiff and, as *amicus curiae,* the Surety Association of America, to amend the Federal Circuit's opinion on the certified issue. Because the Federal Circuit denied both of these motions without discussion, defendant construes this language as accurately reflecting the scope of equitable subrogation.

Plaintiff responds that the quoted language is dicta and was not central to the court's holding. The "quoted statement only makes sense if it is viewed as referring only to the sureties of subcontractors. Otherwise[,] the statement is seriously in error; contrary to Supreme Court precedent; and does not represent the holding in *Munsey* ...." Pl.'s Br. filed Nov. 8, 2002, at 11. The dicta are contrary to the Supreme Court's holding in *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), "and [are] inconsistent with the holdings in the majority of cases decided both before and after *Pearlman* acknowledging

8. Defendant's and plaintiff's other arguments, *i.e.,* the timing of plaintiff's subrogation rights, the impact of stakeholder status, the potential breach of Modification No. P00002, and the duty to offset any amount received in the district court litigation, require an analysis of factual issues and are thus discussed in the context of the parties' cross-motions for summary judgment. *See infra* section II.

Tucker Act [j]urisdiction over suits by payment bond sureties." *Id.*

The court agrees that the language in question was not central to the *West II* court's holding and may be viewed properly as dicta. Although Supreme Court dicta are binding on subordinate lower federal courts, *Stone Container Corp. v. United States,* 229 F.3d 1345, 1349–50 (Fed.Cir.2000), the Federal Circuit has cautioned that dicta in its own decisions "should be read in the light of the court's central holding and the controlling fact in that case," *F. Alderete Gen. Contractors, Inc. v. United States,* 715 F.2d 1476, 1479 (Fed.Cir.1983). The disputed language appears in part III of the *West II* opinion, which concerns the issue of sovereign immunity—not substantive rights. The central holding of the *West II* court was that sovereign immunity does not bar a surety's claim against the United States, as the Tucker Act waived sovereign immunity against claims by assignees. *West II* at 1375.

The language follows the Federal Circuit's discussion of the Supreme Court's holding in *Blue Fox,* 525 U.S. at 264–65, 119 S.Ct. 687. *Blue Fox* involved a plaintiff subcontractor seeking to recover directly from the Government after not receiving payment from a non-bonded contractor.[9] The Court recognized that its holding accorded with "the established rule that, unless waived by Congress, sovereign immunity bars subcontractors and other creditors from enforcing liens on Government property or funds to recoup their losses." 525 U.S. at 265, 119 S.Ct. 687. Because subcontractors were barred from bringing claims directly against the Government, Congress had enacted the Miller Act to provide subcontractors with "the right to sue on the surety bond posted by the prime contractor, not the right to recover their losses directly from the Government." *Id.* at 264, 119 S.Ct. 687.

In discussing *Blue Fox,* the Federal Circuit noted that there was "nothing particularly novel about the Supreme Court's holding."

*West II* at 1371. It has long been settled that a subcontractor is barred from bringing a claim directly against the Government; rather, its recourse lies under the Miller Act. *See, e.g., Munsey,* 332 U.S. at 241, 67 S.Ct. 1599 (laborers and materialmen have no enforceable rights against United States for compensation); *United Elec. Corp. v. United States,* 227 Ct.Cl. 236, 244, 647 F.2d 1082, 1087 (1981) (plaintiff subcontractor has no standing to sue United States to recover contract payments); *United States Fid. & Guar. Co. v. United States,* 201 Ct.Cl. 1, 11, 475 F.2d 1377, 1382 (1973) ("*USFG*") (laborers and materialmen have equitable rights to contract retainage but no standing to sue Government); *Continental Cas. Co. v. United States,* 164 Ct.Cl. 160, 163, 1964 WL 8559 (1964) (Miller Act passed to protect laborers who have no enforceable rights against Government for compensation).

While the law is settled that subcontractors lack standing to sue the Government directly, this court respectfully must conclude that the dicta in *West II*—stating that a surety steps into the shoes of a subcontractor, and not the contractor for which it issued bonds—are not supported by precedent. The *West II* court cited *Munsey* in support of its statement regarding the scope of subrogation. *Munsey,* a case on review from the United States Court of Claims, involved six contracts, bonded by the same surety, the deficient performance of which culminated in litigation. Plaintiff was appointed as receiver for the contract proceeds withheld by the Government. Upon demand for these proceeds, the Government deducted an amount due to it owing to the prime contractor's default on one of the contracts. Plaintiff and the surety protested the set-off.

In the passages cited by the *West II* court in support of the conclusion that sureties are subrogated to the rights of subcontractors only, the Supreme Court upheld the Government's set-off, noting that the United States

---

**9.** Plaintiff brought an action in district court, asserting an equitable lien on any funds reserved for completion of the project or not already paid to the contractor. Although the Ninth Circuit concluded that the Government had waived its immunity to plaintiff's claim under the Adminis-

trative Procedure Act, 5 U.S.C. § 702 (the "APA"), the Supreme Court reversed, concluding that plaintiff's claim sought a money judgment and was not redressable under the APA's waiver of sovereign immunity. 525 U.S. at 263, 119 S.Ct. 687.

was not a general creditor and possessed a superior right to the funds owed to it. *Munsey*, 332 U.S. at 240, 67 S.Ct. 1599. More relevant to the issue of equitable subrogation, the Court stated that it previously had recognized "the peculiarly equitable claim" of subcontractors "to be paid from available moneys ahead of others" when the Government was holding contract funds as "a mere stakeholder ... [with] no rights of its own to assert." *Id.* at 240, 67 S.Ct. 1599. The Court noted that a surety which discharged the obligation to pay the outstanding claims of subcontractors "could claim subrogation,"[10] *id.* at 241, 67 S.Ct. 1599, but that, if "relying on the rights of the laborers and materialmen ... the surety must establish that those rights existed before their claims were paid," *id.* at 241–42, 67 S.Ct. 1599. This was so because "[o]ne who rests on subrogation stands in the place of one whose claims he has paid, as if the payment giving rise to the subrogation had not been made." *Id.* at 242, 67 S.Ct. 1599. However, the Court also reaffirmed the well-settled proposition that subcontractors "do not have enforceable rights against the United States for their compensation." *Id.* at 241, 67 S.Ct. 1599 (citations omitted).

The Court revisited its *Munsey* opinion in *Pearlman*, 371 U.S. at 140–41, 83 S.Ct. 232. The Court in *Pearlman* analyzed the claim of a surety that claimed entitlement to contract funds paid to the contractor's bankruptcy trustee. Pursuant to the terms of the contract, the Government withheld a percentage of the progress payments due to the contractor. After the contractor defaulted on its performance obligations, the surety paid the outstanding claims of the subcontractors and the Government hired another contractor to complete the project. Once it accepted completion of the project, the Government, over the surety's objection, turned the withheld funds over to the bankruptcy trustee, as the original contractor had declared bankruptcy subsequent to defaulting on the contract.

The Court addressed the argument that *Munsey* and/or the Miller Act had repudiated the principle, previously recognized by the Court in *Prairie State Bank v. United States*, 164 U.S. 227, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896), and *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), that sureties are subrogated to a security interest in funds withheld by the Government. Noting that "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed," *Pearlman* 371 U.S. at 136–37, 83 S.Ct. 232, the Court addressed whether *Munsey* overturned this "equitable principle[ ] so deeply imbedded in our commercial practices, our economy, and our law," *id.* at 140, 83 S.Ct. 232.

The *Pearlman* Court first analyzed the holdings of *Prairie Bank* and *Henningsen*. *Prairie Bank* involved rival claims by a surety—forced to complete performance on a government contract after the contractor's default—and plaintiff bank—which advanced monies to the contractor before its default—to a contractually mandated retention fund still held by the Government. The Court held that "this fund materially tended to protect the surety;" this logic "followed an already established doctrine that a surety who completes a contract has an 'equitable right' to indemnification out of a retained fund ...." *Pearlman*, 371 U.S. at 137–38, 83 S.Ct. 232. *Henningsen* involved a contractor that completed the construction project required of it, but that defaulted after failing to satisfy the claims of its subcontractors. "This Court applied the equitable principles declared in the *Prairie Bank* case so as to entitle the surety [which paid the subcontractors] to the same equitable claim to the retained fund that the surety in the *Prairie Bank* case was held to have." *Id.* at 139, 83 S.Ct. 232.

The *Pearlman* Court thus concluded that the two cases "establish the surety's right to

---

**10.** A surety may invoke equitable subrogation only after paying subcontractors' outstanding claims. *United Pac. Ins. Co. v. United States*, 162 Ct.Cl. 361, 364, 319 F.2d 893, 895 (1963); *Home Indem. Co. v. United States*, 180 Ct.Cl. 173, 179,

376 F.2d 890, 894 (1967); *Fireman's Fund Ins. Co. v. United States*, 190 Ct.Cl. 804, 808–09, 421 F.2d 706, 708 (1970). This issue is more thoroughly discussed *infra* section II 1.

subrogation in such a [retained] fund whether its bond be for performance or payment." 371 U.S. at 139, 83 S.Ct. 232. It then moved on to the effect of *Munsey* on the scope of equitable subrogation:

> The final argument is that the *Prairie Bank* and *Henningsen* cases were in effect overruled by our holding and opinion in ... *Munsey* .... We held that the Government could exercise well-established common-law rights of debtors to offset claims of their own against creditors. This was all we held. The opinion contained statements which some have interpreted as meaning that we were abandoning the established legal and equitable principles of the *Prairie Bank* and *Henningsen* cases under which sureties can indemnify themselves against losses. But the equitable rights of a surety declared in the *Prairie Bank* case as to sureties who complete the performance of a contract were expressly recognized and approved of in *Munsey*, and the *Henningsen* rule as to sureties who had not completed the contract but had paid laborers was not mentioned. *Henningsen* was not even cited in the *Munsey* opinion. We hold that *Munsey* left the rule in *Prairie Bank* and *Henningsen* undisturbed. We cannot say that such a firmly established rule was so casually overruled.

371 U.S. at 140–41, 83 S.Ct. 232 (footnotes omitted).

Thus, the Court firmly limited *Munsey* to its holding regarding the Government's ability to offset its losses before releasing disputed contract payments. Nothing in either *Munsey* or *Pearlman* restricted sureties to invoking the rights of subcontractors only; in fact, the Court in *Pearlman* framed the doctrine of equitable subrogation as allowing the surety to enforce the rights of a party whose debts the surety discharged. 371 U.S. at 136–37, 83 S.Ct. 232.

In a series of cases decided after *Pearlman*, the Court of Claims expressly recognized the right of a surety to subrogate to the position of a defaulting contractor. *Fireman's Fund*, 190 Ct.Cl. at 808, 421 F.2d at 708; *Home Indem.*, 180 Ct.Cl. at 177, 376 F.2d at 893; *United Pac.*, 162 Ct.Cl. at 364,

319 F.2d at 895. The court also resolved a potential conflict between *Munsey* and *Pearlman*, and, in doing so, reinforced the legal principle that a surety can subrogate to the rights of a defaulted contractor. *See USFG*, 201 Ct.Cl. at 9–10, 475 F.2d at 1382. In *Pearlman* the Supreme Court used broad language which could be taken "to infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly" against the Government. *USFG*, 201 Ct.Cl. at 10, 475 F.2d at 1382. This interpretation, however, would be "in complete conflict with the language in *Munsey*," *id.*, which indicated that subcontractors have no standing to sue the Government directly.

The *USFG* court harmonized the holdings by noting that the *Pearlman* Court had ruled:

> [T]he surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States].

201 Ct.Cl. at 10, 475 F.2d at 1382.

Thus, the *USFG* court recognized that a surety, after paying off any outstanding claims by subcontractors, becomes subrogated to the rights of the contractor and the subcontractors; because the subcontractors have no standing to sue the United States directly, the surety must, and can, stand in the shoes of the contractor to bring its action. *See Continental Cas.*, 164 Ct.Cl. at 162–63 (noting that subcontractors cannot sue United States to satisfy their outstanding claims).

The Court of Claims adhered to the *USFG* court's formulation of equitable subrogation. For example, in *United Electric*, the court revisited the issue of whether a subcontractor had standing to sue the United States for compensation due under a subcontract. It

noted that the *USFG* court had determined that a surety must pay completely the outstanding claims of subcontractors before suing the Government for payments owed and that the subcontractors did not have standing to sue the Government on their own behalf. *United Electric*, 227 Ct.Cl. at 238, 647 F.2d at 1083. The court in *United Electric* found no reason to disturb the principle that, "while the surety gains equitable rights from its subrogation to the subcontractors' claims, its standing to sue ... comes from the fact that it is also subrogated to, and stands in the shoes of, the contractor, an entity which is clearly in privity of contract with the Government." 227 Ct.Cl. at 242, 647 F.2d at 1086.

The Federal Circuit echoed this language in *Balboa*, 775 F.2d at 1161. In addressing a plaintiff surety's claim that the Government improperly issued a payment to the bonded contractor after receiving notice of its default, the court first responded to the Government's contention that neither the Claims Court nor the Federal Circuit possessed jurisdiction over the suit. In determining that it had jurisdiction, the Federal Circuit observed that the Supreme Court endorsed the doctrine of equitable subrogation in *Prairie Bank* and that the Court of Claims, in *USFG*, had "clarified the respective rights of subcontractors and Miller Act sureties to sue the United States." *Balboa*, 775 F.2d at 1161. The *Balboa* court then quoted the passage from *USFG* to the effect that the surety is subrogated to both the rights of the contractor and to those of the laborers and materialmen whose claims it discharged. 775 F.2d at 1161 (quoting *USFG*, 201 Ct.Cl. at 10, 475 F.2d at 1382).

The Federal Circuit affirmed the right of the surety to step into the shoes of the contractor. In *Transamerica Insurance Co. v. United States*, 989 F.2d 1188, 1193 (1993), the court noted that the *Balboa* surety "was found by this court to be entitled to assert rights against the government for breaching its obligation to the surety." In 1998 the Federal Circuit, in discussing plaintiff's argument that *Balboa* "gave sureties some rights under Government contracts," noted that "[o]ur case law has long established that a surety can sue the Government in the Court of Federal Claims under the non-contractual doctrine of equitable subrogation" and that, in doing so, the surety assumes "the place of the contractor." *Admiralty Constr., Inc. v. Dalton*, 156 F.3d 1217, 1221 (1998).

■ Read against the foregoing precedent, the dicta in *West II* do not define the scope of a surety's rights under the doctrine of equitable subrogation. When a surety, after financing or completing the performance of a defaulted contractor, discharges the outstanding claims of the subcontractors, it may subrogate to the rights of both the defaulted contractor and the subcontractors. *Balboa*, 775 F.2d at 1161; *USFG*, 201 Ct.Cl. at 10, 475 F.2d at 1382. Because the subcontractors have no standing to sue the Government directly, the surety must invoke the contractor's right to sue in order to sustain its claim against the Government. *Id.* If a surety were limited to exercising the rights of only the subcontractors under the doctrine of equitable subrogation, the surety never would be able to recover directly from the contracting agency. Such a result would contradict a century of jurisprudence on equitable subrogation.

Plaintiff has stated a claim under the doctrine of equitable subrogation to stand in PCE's shoes and bring its claim directly against the United States. Accordingly, defendant's motion to dismiss based on the impact of *West II* is denied.

### 2. Progress payments and the release

If plaintiff is entitled to assert the rights held by PCE, defendant reasons that plaintiff is also subject to any defenses that the Government could maintain against PCE. The Government paid the entirety of the contract price to PCE, and PCE, upon receipt of the final payment, executed a release absolving the United States of any liability for claims arising under the contract. Defendant thus concludes that plaintiff may not assert a claim for the contract price after the Government discharged its duty under the contract and became shielded from future litigation by the release.

Plaintiff relies on the notice that it provided to defendant—before the issuance of the

contract payments and the execution of the release—of PCE's inability to finish the contract without assistance. This notice, plaintiff maintains, triggered the Air Force's stakeholder duty, thereby restricting it from unilaterally making payments owed under the contract to PCE. Plaintiff also draws upon the law of assignment that, once an obligor has notice of an assignment, the assignor is powerless to enter into a release. From this proposition plaintiff extracts a prohibition against PCE's execution of the release with defendant.

It is well-settled that a subrogee, when standing in the shoes of the subrogor, may assert only the rights held by the subrogor. *Munsey*, 332 U.S. at 242, 67 S.Ct. 1599 ("[O]ne cannot acquire by subrogation what another whose rights he claims did not have."). The corollary of this legal principle is that a party asserting the rights of another is subject to the same defenses that may be asserted against the original claimant. *Produce Factors Corp. v. United States*, 199 Ct.Cl. 572, 582, 467 F.2d 1343, 1349 (1972) ("[T]he assignee's rights are subject to, *inter alia*, defenses arising under the contract which the Government could have asserted against the contractor absent the assignment . . . .").

■ Defendant offers case law speaking to other legal issues [11] and fails entirely to address plaintiff's contention that the Air Force, once it received notice of PCE's default, became a stakeholder in the contract funds. Upon notice from a surety of a bonded contractor's default, the contracting agency becomes a stakeholder in the contract funds not yet expended. *Ransom v. United States*, 900 F.2d 242, 245 (Fed.Cir.1990) ("[T]he government becomes a 'stakeholder' for remaining contract proceeds when a payment and performance bond surety notifies the government that the surety's interest is in jeopardy because of default by the contractor."); *Balboa*, 775 F.2d at 1162 ("We agree with the conclusion of the Court of Claims that, upon notification by the surety

of unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default.").

PCE's president, Mr. Braum, notified the Air Force on November 21, 1997, that it was financially unable to complete the construction contracts on which it was bonded by plaintiff and requested that all contract funds be paid to plaintiff. On December 4, 1997, Mr. Sawyer, plaintiff's Surety Claims Analyst, confirmed PCE's November 21, 1997 letter and reiterated that payments should be sent to plaintiff's San Diego office. Mr. Braum again wrote to the Air Force on January 28, 1998, requesting that the remittance address for the subject contract be changed to plaintiff's San Diego office, and the Air Force effected this change through Modification No. P00002 to the contract, issued on January 29, 1998. Consequently, it is clear that the Air Force properly may be characterized as a stakeholder as early as December 4, 1997. *See American Fid. Fire Ins. Co. v. United States*, 206 Ct.Cl. 570, 578–79, 513 F.2d 1375, 1379–80 (1975) (receipt of demand from plaintiff surety for unpaid contract funds triggered Government's stakeholder duty); *Home Indem.*, 180 Ct.Cl. at 178, 376 F.2d at 893 (Government became stakeholder upon surety's request that contract funds be retained pending settlement of unpaid laborers' claims); *International Fid.*, 41 Fed.Cl. at 716 (Government "contractually acknowledged a stakeholder's duty" by modifying contract to require joint payment of surety and contractor).

■ Once serving as a stakeholder, the Government, "caught in the middle between two competing claimants, cannot, in effect, decide the merits of their claims by the mere physical act of delivering the stake to one of them." *Newark Ins. Co. v. United States*, 144 Ct.Cl. 655, 658–59, 169 F.Supp. 955, 957 (1959). Instead, the Government must show that its "payment to the contractor rather than the surety 'was a reasonable exercise of

**11.** Defendant cites *Berkeley v. United States*, 149 Ct.Cl. 549, 276 F.2d 9 (1960), for the proposition that a surety subrogee has no claim against the United States after it has discharged its payment obligation, and *Omaha Indemnity Co. v. Johnson & Towers, Inc.*, 599 F.Supp. 215 (E.D.N.Y.1984), for the principle that a subrogee is subject to a release executed by the subrogor. Neither of these cases addresses plaintiff's stakeholder argument.

the discretion conferred on the contracting agency by the terms of the contract and the applicable law and regulations.'" *West II* at 1371 (quoting *Balboa,* 775 F.2d at 1165). The Government cannot forward the theory that it has discharged its duty under the contract, thereby depriving the Court of Federal Claims of jurisdiction, when it has admitted to performing acts which render it a stakeholder.[12]

■ Although not argued by plaintiff, the same logic would preclude defendant from contending that plaintiff's claims are jurisdictionally barred by the release executed between PCE and the United States. The consideration for the release was $174,000.00, the full amount of contract funds paid to PCE. Because those funds were distributed while the Air Force was serving as a stakeholder, the release cannot operate as a jurisdictional bar to plaintiff's claim. Moreover, plaintiff points to the fact that the Air Force, through the November 21, 1997, and December 4, 1997, letters, was on notice that PCE effectively had assigned its rights to the contract payments to plaintiff.[13] "After notice of the assignment has been given to the obligor, or knowledge thereof received by him in any manner, the assignor has no remaining power of release." 9 Corbin on Contracts § 890 (Interim ed.2002).

Accordingly, defendant has not shown that the contract payments made to PCE, or the release executed between defendant and PCE, preclude plaintiff from asserting a claim over which this court has jurisdiction. Accordingly, defendant's motion to dismiss based on the defenses of payment and release is denied.

## II. *Motions for summary judgment*

1. *Timing of plaintiff's subrogation rights*

In its cross-motion for summary judgment, defendant, relying primarily on *USFG,* ar-gues that plaintiff was subrogated to PCE's rights only upon payment of all outstanding claims of the subcontractors. Both parties agree that plaintiff financed PCE's performance of the contract between January 9, 1998, and May 28, 1998.[14] Consequently, in defendant's view, plaintiff's claim is limited to the last progress payment, rendered on July 6, 1998, as plaintiff's subrogation rights did not ripen until after the first two progress payments were made to PCE.

Plaintiff attempts to distinguish *USFG* by claiming that sureties, like plaintiff, which were acting under an obligation imposed by a performance bond, possess subrogation rights that relate back to the date on which the performance bond was issued. It also reiterates that a stakeholder may not elect unilaterally to pay out disputed funds, arguing that if "the Government's position is followed to its logical conclusion, then a performance bond surety would have no rights to the contract funds until the project is fully completed." Pl.'s Br. filed Nov. 8, 2002, at 9.

In *USFG* plaintiff surety issued both a performance and payment bond to the contractor charged with modifying a building at the United States Naval Station in Boston, Massachusetts. Several months after the contract was awarded, plaintiff began receiving complaints of nonpayment from subcontractors on the project. Prior to the issuance of the seventh progress payment, plaintiff informed the Navy of the subcontractors' complaints, indicated that it considered the contractor in default, and demanded that the Navy refrain from making any further payments. Citing an insufficient basis on which to warrant the cessation of payments, the Navy made the seventh progress payment to the contractor; however, after additional correspondence with plaintiff, the Navy became convinced that the

---

12. The ramifications of the Air Force's status as a stakeholder on plaintiff's motion for summary judgment are discussed *infra* section II 2.

13. Owing to the similarity of certain principles of subrogation and assignment, the law of assignment has informed many decisions concerning equitable subrogation. *See, e.g., West II* at 1374 (discussing, before concluding that subrogee's claim not barred by sovereign immunity, how an assignee steps into shoes of assignor for all purposes).

14. Defendant reserves the right to challenge in future proceedings whether all of these payments are properly attributable to the contract at issue.

contractor's performance was unsatisfactory. It then instituted a change order deleting the unfinished portion of the contract and entered into direct contracts with several of the subcontractors to finish the outstanding work.

Plaintiff filed suit in interpleader and deposited the limit of its payment bond in district court, which was used to pay off, on a *pro rata* basis, the subcontractors' unpaid bills. The deposited funds did not discharge all of the subcontractors' claims, which remained unpaid when plaintiff filed suit against the Navy to recover the seventh progress payment and the amount unexpended by the Government under the contract.

The Court of Claims recognized that "when the Government is in the position of a stakeholder, it is not free simply to pay the contractor when the surety has given adequate notice of other competing claims to the fund." *USFG*, 201 Ct.Cl. at 7–8, 475 F.2d at 1380. However, it also noted that the plaintiff surety "has no claim of priority to the fund unexpended under the contract," because the "surety was required to show that it had fully paid the claims of the laborers and materialmen arising out of the contract before it could share in the unexpended sums retained under the contract." 201 Ct.Cl. at 8, 475 F.2d at 1381. The court reached the same conclusion regarding the disputed progress payment. 201 Ct.Cl. at 16, 475 F.2d at 1385.

■ Thus, the Court of Claims held that a surety must satisfy the outstanding claims of subcontractors before it can lay claim to the contract funds not expended by the Government. *See Balboa*, 775 F.2d at 1161 (surety must first pay subcontractors before invoking equitable subrogation); *United Pac.*, 162 Ct. Cl. at 364, 319 F.2d at 895 (same). Defendant bolsters this argument with Supreme Court language indicating that a party seeking to invoke the rights of another must first "have paid a debt due to a third party, before he can be substituted to that party's rights ...." *Prairie Bank*, 164 U.S. at 231, 17 S.Ct. 142.

■ Defendant's position that a surety must satisfy the subcontractors' outstanding claims before it can stand in the shoes of the contractor is sound. Yet, plaintiff is also correct that, once the subcontractors are paid, the surety's rights of subrogation "relate back to the date of the execution of the surety bonds." *Home Indem.*, 180 Ct.Cl. at 177, 376 F.2d at 893; *see also National Sur.*, 118 F.3d at 1546; *Fireman's Fund*, 190 Ct. Cl. at 808, 421 F.2d at 708.

For example, in *Home Indemnity*, the Bureau of Land Management paid the balance of the contract to the contractor, despite the fact that the contractor had not fully satisfied the claims of two of its suppliers. The contractor's surety did not satisfy these debts until 13 months after the contractor received payment. The surety brought suit to recover the final payment, and the Court of Claims agreed that the Government was liable to plaintiff. When plaintiff supplied notice of the contractor's default and demanded that the Government withhold the final contract payment, "the defendant should have known that the contractor no longer had any property rights in the contract fund." 180 Ct.Cl. at 178, 376 F.2d at 893. When the Government "ignored plaintiff's rights by paying the contract retainage to the contractor ... plaintiff was required to and did satisfy the claims of the materialmen." 180 Ct.Cl. at 179, 376 F.2d at 894. After doing so, plaintiff "was entitled to look to the retained funds for reimbursement," 180 Ct.Cl. at 177, 376 F.2d at 893, as its subrogation rights related back to the date on which it issued the bonds.

■ Applying this framework to the case at bar, the court finds that plaintiff's rights to equitable subrogation relate back to September 4, 1997, the date on which it executed the performance and payment bonds. Plaintiff has satisfied its obligation to pay the outstanding claims of PCE's subcontractors, as both parties agree that plaintiff completed financing PCE's performance on May 28, 1998. Moreover, plaintiff provided notice of PCE's default through its letter of December 4, 1997, which reiterated Mr. Braum's November 21, 1997 request that payment be made to plaintiff's San Diego office. This correspondence occurred before any of the contract payments were issued to PCE, as all

three payments were submitted by PCE and paid by the Air Force in 1998. It would be contrary to precedent were plaintiff, under this framework, restricted to recovering only the last contract payment.

Accordingly, plaintiff's motion for summary judgment is granted insofar as its subrogation rights relate back to September 4, 1997, the date on which it issued its performance and payment bonds. Defendant's cross-motion for summary judgment based on the timing of plaintiff's subrogation rights is denied.

### 2. *The Air Force's duties as stakeholder*

In its motion for summary judgment, plaintiff asserts that the Air Force, as a stakeholder, breached its duty to plaintiff when it failed to issue the payments in conformance with Modification No. P00002.

*Balboa* involved a disputed progress payment. Despite previous notice from plaintiff surety that the contractor would not be able to fulfill its obligation, coupled with a demand from the surety that no further contract payments be made without its consent, the contracting agency issued the progress payment to the contractor. The Federal Circuit recognized "a significant difference between the Government's role before and after completion of the performance on a contract." 775 F.2d at 1164. During performance the Government has a "vital interest" in the timely completion of work, and federal procurement officials are permitted "broad discretion and flexibility" in executing their duties. *Id.* However, once the government representative receives notice of the contractor's potential default, discretion is tempered by a duty to exercise it responsibly vis-à-vis the surety's interest in the contract funds. *Id.* In order to effect this balance, the Federal Circuit devised eight factors to determine "whether the Government has exercised reasonable discretion in distributing the funds." [15] *Id.* On the basis of these factors, the *Balboa* court overturned a decision based solely on the fact that contract performance was on schedule three weeks before the disputed payment was issued. *Id.* at 1165

Neither plaintiff nor defendant addresses the *Balboa* factors. Plaintiff instead analogizes its case to *Transamerica Premier*, 32 Fed.Cl. 308, and *International Fidelity*, 41 Fed.Cl. 706, arguing that the favorable outcomes in those cases mandate a similar result. The facts of *Transamerica Premier* and *International Fidelity* are similar to the case at hand, insofar as both cases involved contractors that, in danger of defaulting on their contractual obligations, requested jointly with their sureties contract modifications which allowed payment to be delivered to the sureties. Also, in both cases subsequent payments were made solely to the contractors in violation of the contract modifications.

The *Transamerica Premier* court, however, rejected the applicability of *Balboa* to the facts presented, noting that the *Balboa* court articulated its eight factors "to measure the reasonableness of the Government's conduct before the completion of the contract." *Transamerica Premier*, 32 Fed Cl. at 315; *see also USFG*, 201 Ct.Cl. at 14, 475 F.2d at 1384 (during performance of contract, when government agency notified of contractor's nonpayment of obligations, "the representative is faced with the task of balancing the Government's interests in proceeding with the contract, against possible harm to the surety"). The government agency in *Transamerica Premier* did not become a stakeholder until after the completion of the contract, when the Government's interest in the contract funds "does not extend beyond avoiding liability for sending the retained funds to the wrong party." 32 Fed.Cl. at 316.

On the other hand, the *Transamerica Premier* decision, in a footnote, questioned why the "Government's need for leeway in the management of contract funds during performance—this being the essential thrust of the *Balboa* decision—can or should absolve the Government from its responsibility to direct funds to the addresses named in a properly executed contract modification." 32 Fed.Cl. at 315 n. 6. The *International Fidelity* decision quoted this language when concluding that the *Balboa* factors did not apply to a surety's claim for a progress payment made

---

**15.** These eight factors are set forth in *Balboa,*   775 F.2d at 1164–65.

wrongfully to the contractor during performance of the contract. The court in *International Fidelity* supported this conclusion by noting that the government agency was not exercising informed discretion when it sent the payment solely to the contractor in violation of the modification; rather, its actions amounted to "inefficient payment procedures at best resulting in error when cutting the final check." 41 Fed.Cl. at 719. The Air Force's actions at bar may be characterized in a similar fashion, as the contracting officer admitted in a January 26, 1999 letter to plaintiff that the three payments were issued to PCE directly because the "modification [to the contract] was not received by the paying office."

Thus, while the balance of authorities tilts in plaintiff's favor, the court is reluctant to grant plaintiff summary judgment on this issue because the parties fail to address pivotal aspects of the analysis. Although *Balboa* emphasized that the timing of payments is crucial to the court's resolution of the surety's claim, neither party has provided the court with the exact date of completion of performance [16] or has addressed the applicability of *Balboa* or the eight factors by which to judge reasonableness. Without the requisite information, the court cannot grant plaintiff's motion for summary judgment on this issue.

### 3. *Breach of contract*

As a subset of its stakeholder argument, plaintiff contends that the Government breached the contract by failing to comply with Modification No. P00002. Plaintiff quotes from *National Surety*, in which the Federal Circuit concluded that the Government's failure to retain a contractually mandated percentage of the progress payments was a change in the contract's terms, rendering the Government liable to the surety. 118 F.3d at 1547. From this proposition, plaintiff extrapolates the principle that "when the surety acts in reliance upon a contract modification by financing the Contractor, the Government's improper release of the security

cannot avoid liability and the Government is responsible to [plaintiff]." Pl.'s Br. filed Nov. 8, 2002, at 5.

Defendant responds that plaintiff did not step into the shoes of the contractor until May 28, 1998, the date on which plaintiff completed financing PCE's performance, and that, as PCE "incurred no damage resulting from the Government's payment to the wrong address," Def.'s Br. filed Dec. 9, 2002, at 5, plaintiff, as subrogee to PCE's rights, is barred from bringing a breach claim. The court has determined that plaintiff's equitable subrogation rights relate back to September 4, 1997, the date on which it issued the performance and payment bonds, and defendant fails to address the effect of the Air Force's stakeholder status on the breach claim.

Both parties focus their arguments on the impact of *National Surety*, a case which does not directly address the import of a modification such as the one presented here. Plaintiff raised the breach claim only obliquely in its summary judgment brief, and, although the parties agree that Modification No. P00002 changed the remittance address for payments, and not the payee on the checks, they have not discussed the significance of these facts in their respective motions. Accordingly, the court must deny both motions for summary judgment on this issue, as there is an insufficient legal basis and factual development in the record to warrant a grant of summary judgment.

### 4. *Recovery from district court litigation*

Plaintiff brought suit against PCE in the United States District Court for the District of Hawaii in order to recover losses incurred on various construction contracts on which it bonded PCE. Simultaneous with the filing of its complaint, plaintiff sought and obtained a prejudgment attachment of PCE's bank accounts, and some of these funds were deposited with the clerk's office. The district court litigation was dismissed without prejudice on July 24, 2001. As a condition of dismissal, the parties stipulated that all of

16. The dates of the payments to PCE indicate that most, if not all, of the three payments were

made before completion of the contract.

the deposited funds and any interest accrued thereon would be released to plaintiff.

Because of its recovery in the Hawaii litigation, defendant assumes that plaintiff "has already been reimbursed, at least in part, for its losses on this contract." Def.'s Br. filed Oct. 7, 2002, at 15–16. Plaintiff responds by submitting the affidavit of Ms. Vincent, plaintiff's Surety Claims Manager. Ms. Vincent attests that she has personal knowledge of plaintiff's efforts to recover the losses incurred under the bonds issued to PCE and that any funds recovered in the district court litigation "were applied to other losses incurred by [plaintiff] under other bonds issued on behalf of PCE [ ]." Affidavit of Cynthia R. Vincent, Oct. 31, 2002, ¶ 5. Ms. Vincent also states that "to the best of [plaintiff's] knowledge, none of the funds recovered in [the district court] litigation from [the] attachment of [PCE's] bank accounts ... were proceeds of any payments made by the United States" in relation to the contract at issue in this litigation. *Id.* According to Ms. Vincent, plaintiff has recovered no funds from PCE or its president, Mr. Braum, other than those received in the Hawaii litigation. *Id.* ¶ 8. Plaintiff therefore claims an unreimbursed loss on its performance bond in the amount of $124,443.71. *See* Affidavit of Brian R. Sawyer, Aug. 29, 2002, ¶ 12 & Ex. A.

Defendant complains that plaintiff has offered no explanation as to why the monies recovered in the district court litigation were not applied on a *pro rata* basis to plaintiff's losses on the subject contract. It will be sufficient to put plaintiff to its proof either on a renewed motion for summary judgment or at trial.

## CONCLUSION

Once a surety discharges the outstanding bills of subcontractors, it may subrogate to the rights of the defaulted contractor and pursue a direct claim for funds that it alleges were wrongfully distributed to the contractor. Although plaintiff surety is subject to the same defenses which could have been asserted against the contractor, the Air Force's payments to PCE, and the release PCE executed, do not bar plaintiff's claim because the Air Force was on notice of its status as a stakeholder prior to either of these events.

Plaintiff's subrogation rights relate back to September 4, 1997, the date on which it executed the payment and performance bonds for the project at issue; plaintiff's subrogation rights begin on this date because it satisfied the necessary predicate of paying the contractor's debts to its subcontractors no later than May 28, 1998. The court reserves for trial the issues of the reasonableness of the Air Force's payments to PCE, as articulated by *Balboa;* the Air Force's potential breach of Modification No. P00002; and plaintiff's recovery of funds from the district court litigation that are attributable to the three progress payments made by the Air Force to PCE under this contract. Accordingly,

**IT IS ORDERED,** as follows:

1. Plaintiff's motion for summary judgment is granted insofar as it may pursue its claim as surety for payments made by the Air Force to PCE. Plaintiff's subrogation rights relate back to September 4, 1997. Plaintiff's motion is otherwise denied without prejudice, and defendant's motion to dismiss and cross-motion for summary judgment are denied.

2. The parties shall file a Joint Status Report by March 31, 2003, proposing a course for further proceedings and a schedule therefor.